1               IN THE UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF TEXAS

3                         EL PASO DIVISION

4

5   UNITED STATES OF AMERICA            No. EP:04-CR-2091-KC

6   v.                                  El Paso, Texas

7   OMNI CONSORTIUM, INC.,              January 30, 2007
    MULTICULTURAL PROFESSIONALS,
8   MULTICULTURAL EDUCATION CONSULTANTS,
    FLORITA CEDRO TOLENTINO,
9   NOEL CEDRO TOLENTINO, ANGELICA
    TOLENTINO
10

11

12           TRIAL TESTIMONY OF FRANCIA BUENBRAZO

13          BEFORE THE HONORABLE KATHLEEN CARDONE

14                UNITED STATES DISTRICT JUDGE

15  APPEARANCES:

16  For the Government:  J. Brandy Gardes
                         William Lewis
17                       Assistant United States Attorneys
                         700 East San Antonio, Suite 200
18                       El Paso, Texas 79901

19

    For the Defendant
20  Florita Tolentino:   Joseph Sib Abraham
                         P.O. Box 512312
21                       El Paso, Texas 79951

22

23  For the Defendant
    Angelica Tolentino:  Christopher A. Antcliff
24                       Stanton & Antcliff
                         521 Texas Avenue
25                       El Paso, Texas 78209

David A. Perez, RMR, RPR

```
 1   For the Defendant
     Noel Tolentino:        Ronald F. Ederer
 2                          Scott & Hulse
                            1020 NE Loop 410
 3                          San Antonio, Texas 78209

 4   For the Defendant
     Roland Sotelo:         Sidney A. Lyle
 5                          1858 East Keller Parkway, Suite B
                            Keller, Texas 76248
 6

 7

 8       Proceedings recorded by stenotype.  Transcript produced by

 9   computer-aided transcription.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                   (Beginning of requested testimony.)
 2                   (Jury enters courtroom.)
 3              MR. ABRAHAM:  May I proceed, Your Honor?
 4                        CROSS-EXAMINATION
 5   BY MR. ABRAHAM:
 6   Q.  Ms. Buenbrazo, you indicated that you went to work for
 7   Multicultural in January of the year 2002.  Is that correct?
 8   A.  Correct.
 9   Q.  And you left that employment in December of 2002?
10   A.  Yes.
11   Q.  And you say that there came a time when you saw Ms. Florita
12   Tolentino there at the offices of Multicultural in the summer
13   of 2002.  Would that be correct?
14   A.  Yes.
15   Q.  And can you describe for us?  The number of employees that
16   work for Multicultural?
17   A.  Okay.  We have about five.
18   Q.  In other words, Multicultural has five employees that work
19   there in -- in the Philippines for Multicultural, correct?
20   A.  Correct.
21   Q.  Okay.  And you have offices in Maketa(sic)?
22   A.  Makati City.
23   Q.  Say it again.
24   A.  Makati.
25   Q.  Makati City?
```

1   A.  Yes.

2   Q.  And that's where the office is located.

3   A.  Yes.

4   Q.  And that's a short distance from Manila.  Is that correct?

5   A.  Yes.

6   Q.  And is the embassy in Manila?

7   A.  Yes.

8   Q.  About how far is Makati --

9   A.  Makati.

10  Q.  -- Makati from your office to Manila where the embassy is

11  if you're driving a vehicle?

12  A.  Well, I don't drive.

13  Q.  Yes, ma'am.

14  A.  It's far from our office.

15  Q.  How many minutes would it take to get from your office to

16  the consulate?

17  A.  Well, about 15 to 20.  It depends on the traffic.

18  Q.  Sure.  But 15 to 20 minutes.  You say you don't drive.

19  Q.  Okay.  And you indicated that there came a time in the

20  summer of 2002 where you saw Florita Tolentino there at the

21  office for Multicultural and she was talking with an

22  individual, another employee, by the name of Ameil?

23  A.  Right.

24  Q.  What's Ameil's last name?

25  A.  Mateo.

1    Q.  Mateo.  And how many floors is this office for

2    Multicultural?

3    A.  Three floors.

4    Q.  All right.  And is one of the Flores -- does that have a

5    bedroom, bathroom and living quarters?

6    A.  Each floor has its own bathroom, restroom.  The second and

7    third floor has -- has its bedroom.  The third floor is

8    composed of two bedrooms.  The second composed of one room --

9    one bedroom and one office room.

10   Q.  Yes.

11   A.  Yeah.

12   Q.  Now you say that you work for Multicultural.  Is that

13   right?

14   A.  Right.

15   Q.  And when you get paid, do you get paid by way of check or

16   cash?

17   A.  As I could remember, check.

18   Q.  Who was the one that signs that check?

19   A.  I don't -- it's -- it's from Lillibeth DeCastro.  She's our

20   accountant.  So she's the one releasing the check.  I don't

21   know who signed it.  I don't remember.

22   Q.  And what is the -- what is the name at the top of the

23   check?  Is it Multicultural?

24   A.  I don't remember if it is Multicultural.

25   Q.  Okay.  You indicated the other day ago that you worked for

1    Multicultural and Omni.

2    A.   Yes.   Right.

3    Q.   Okay.   Did Omni ever write you a check for any of your

4    services?

5    A.   I don't remember.   Because I don't see the check.   It's

6    directly deposited to the bank.

7    Q.   All right.   Do you receive anything from the bank

8    indicating that you've indeed been paid?

9    A.   I don't understand your question.

10   Q.   Okay.   Do you ever get anything from your bank saying that

11   you have been paid for your services?

12   A.   Right.

13   Q.   Okay.   And is there anything in there -- you don't have any

14   sort of a check, you don't know who the check is from or

15   anything like that.   Is that right?

16   A.   Right.   Because I don't see the check.

17   Q.   Okay.   All right.   In any event, have you ever been to the

18   United States prior to -- to this time?

19   A.   No.

20   Q.   Okay.   You've never been in the Omni offices in Houston?

21   A.   No.

22   Q.   Ever?

23   A.   Not ever.   Not even once.

24   Q.   Now, you indicated that -- that you worked there in the

25   Philippines.   Are you familiar with the name of JS Contractors?

David A. Perez, RMR, RPR

1   A.  Yes.

2   Q.  And tell us who JS Contractors is.

3   A.  Well, it's one of the recruitment agency.

4   Q.  Okay.  And when you say it's a recruitment agency, what do

5   you mean by that?

6   A.  They are the one responsible for the recruitment of

7   applicants, especially for teachers.

8   Q.  Okay.  So, in other words, when you talk about recruitment,

9   you're talking about JS contractors is one of the recruiting

10  agencies that goes out and searchings for teachers that are

11  wanting to come to the United States to be teachers, right?

12  A.  Right.

13  Q.  And what they then do is they then go ahead and visit and

14  interview these teachers.  And they go through some sort of a

15  regiment to decide whether or not they're even applicants for

16  teaching jobs in the United States.

17  A.  Right.

18  Q.  Correct.  All right.  And then that's -- when Multicultural

19  steps into the picture is after JS Contractors has indeed

20  recruited certain teachers or possible teachers.  Is that

21  right?

22  A.  Could you please rephrase the question?

23  Q.  Yes, ma'am.  In other words, Multicultural -- Multicultural

24  now comes into this program after JS Contractors has recruited

25  certain teachers.

1    A.   Before and after.

2    Q.   You're not saying Multicultural is a recruiting agency, are

3    you?

4    A.   It's not a recruitment agency.

5    Q.   Okay.  What I'm trying to say then is JS Contractors is the

6    one that recruits the teachers.

7    A.   Right.

8    Q.   Okay.  Now after they've been recruited, then Multicultural

9    comes in the picture and takes it further to process the

10   teachers coming into the United States.

11   A.   Right.

12   Q.   Okay.  Now who is Universal Staffing?

13   A.   Universal Staffing is one, also, of the recruitment

14   agencies.

15   Q.   Have you ever been to their offices?

16   A.   No.

17   Q.   Have you ever been to the offices of -- of JS Contractors?

18   A.   No.

19   Q.   Have you ever seen it?

20   A.   No.

21   Q.   Okay.  Do you know where it is?

22   A.   No.

23   Q.   Now there's another recruiting agency, isn't there, called

24   Grow, G-R-O-W?

25   A.   I don't know about it.

David A. Perez, RMR, RPR

```
1   Q.  You're not familiar with that?
2   A.  No.
3   Q.  You are familiar, however, with JS Contractors.
4   A.  Uh-huh.
5   Q.  And Universal Staffing?
6   A.  Right.
7   Q.  And both of those are the recruiting agencies that
8   eventually come to your office for the purposes of processing
9   teachers to the United States.
10  A.  Right.
11  Q.  Okay.  Now, you indicated, Ms. Buenbrazo, that you worked
12  for Multicultural for about 11 months.
13  A.  Yes.
14  Q.  Okay.  Do you know a person by the name of George Verara?
15  A.  Yes.
16  Q.  And is he an employee of Multicultural or Omni or one of
17  those companies?
18  A.  Here in the United States.
19  Q.  Yes, ma'am.
20  A.  Yes.
21  Q.  He is -- he is?
22  A.  The Omni employee.
23  Q.  Yes.
24  A.  He's the employee of Florita Tolentino.
25  Q.  Okay.  And is he the one that hired you?
```

1   A.  He's not the one who hired me.  He referred me to Florita

2   Tolentino.

3   Q.  I see.  And whenever you say he referred you to Florita

4   Tolentino, you were living in the Philippines.  And where was

5   George Verara living?

6   A.  Here in the United States.  Houston.

7   Q.  Is there some connection you have with him by way of

8   friendship or relations or anything like that?

9   A.  He's the husband of my cousin.  And he's the -- I'm sorry.

10  He's the husband, yes, of my cousin Anne.

11  Q.  Okay.  In other words, you have a cousin named Anne?

12  A.  Yes.

13  Q.  And she is married to George Verara?

14  A.  Right.

15  Q.  And Anne lives, I presume, in the United States with George

16  Verara.

17  A.  Yes, Houston.

18  Q.  What type of work did George Verara do for Multicultural?

19  A.  Well, as I can remember he's the the accountant.  I don't

20  exactly know his position.

21  Q.  Okay.  All right.  And these recruiting agencies, they

22  don't only recruit for Multicultural, do they?

23  A.  I don't understand your question.

24  Q.  The recruiting agencies, JS Contractors and Universal

25  Staffing, they don't only recruit teachers for Multicultural.

1  They recruit for other companies that are attempting to process

2  teachers that come into the United States, correct?

3  A.  All I know it's not only teachers.  They also recruiting

4  other professions.

5  Q.  Yes.  What -- let me ask the question this way.

6  A.  Okay.

7  Q.  The two agencies that you're familiar with, JS Contractors

8  and Universal Staffing --

9  A.  Right.

10 Q.  -- okay.  You say that they recruit teachers for

11 Multicultural, correct?

12 A.  Right.

13 Q.  They also recruit teachers for other companies there in

14 Manila and in the Philippines that are also attempting to bring

15 teachers into the United States.

16 A.  I don't know about it.

17 Q.  You don't know about that?

18 A.  No.  I don't know because --

19 Q.  Do you know any of the employees that work at -- at these

20 two recruiting agencies?

21 A.  What -- um, no.  I only heard names.

22 Q.  Okay.  You've never met anybody from the JS Contractors or

23 Universal Staffing?

24 A.  I met from the Universal Staffing.  I met Selong.

25 Q.  Say it again.

```
 1   A.  Selong.  It's her last name.

 2   Q.  Sela?

 3   A.  Selong.

 4   Q.  Okay.  And she is with Universal Staffing?

 5   A.  Universal Staffing.

 6   Q.  Is she the only one that you know from either one of those

 7   recruiting agencies?

 8   A.  I met one Jocelyn -- Jo Sanchez.

 9   Q.  Okay.  And who does she work for?

10   A.  For Universal Staffing at that time.

11   Q.  And when did you meet her?

12   A.  During the Fast exam.

13   Q.  Okay.  All right.  That was back in the year 2002?

14   A.  '02.

15   Q.  Is that the same time that you met this Selong?

16   A.  Right.

17   Q.  Okay.  Anybody else that you met from either of those

18   recruiting agencies there in the Philippines?

19   A.  I met some.  But I don't know their names.  But -- yeah, I

20   don't know really their names.

21   Q.  You know that Universal Staffing and also JS Contractors

22   have offices separate and apart from Multicultural, correct?

23   A.  Yes.

24   Q.  Okay.  And do you know who the lead person is at JS

25   Contractors?
```

1    A.   I know the owner J- -- Universal, not for -- for JS.

2    Q.   Okay.  Who is the owner of Universal Staffing?

3    A.   Yoli DeCastro.

4    Q.   Have you ever met here before?

5    A.   I seen her once.

6    Q.   When would that have been?

7    A.   During the -- let's -- in the hotel, Fast exam.

8    Q.   Okay.  Now, when you started in January of 2002, you

9    indicated that there came a time when your duties were to

10   prepare packets for the United States embassy there in Manila.

11   Is that correct?

12   A.   Right.

13   Q.   Okay.  Now, there came a time, you say, when you saw

14   Florita Tolentino sometime in the summer of 2002 and began

15   talking with Ameil Mateo.  Is that right?

16   A.   Right.

17   Q.   And his office or his desk is just a very short distance

18   away from yours.

19   A.   Right.

20   Q.   And you say the other day ago that Florita came down and

21   she had in her hands two separate contracts?

22   A.   Right.

23   Q.   And did she say Hey, Ameil, I have two separate contracts

24   here?

25   A.   No.

1  Q.  Did she say that, I've got 16 contracts here?  And I've got

2  38 contracts here?

3  A.  She didn't say that.

4  Q.  Okay.  That's what I thought you said the other day ago.

5  And she didn't say that, did she?

6  A.  She didn't say that.  But I can see her holding the two

7  kinds of contract in her hand.

8  Q.  Yes.  Didn't make a comment about 16 and 38 or anything

9  like that, correct?

10 A.  Please rephrase the question.

11 Q.  Did there come a time when she told you or told Ameil

12 Mateo, I've got 16 contracts here and I've got 38 contracts

13 here?  Did she ever tell you that?

14 A.  No.

15 Q.  Okay.  Now, this is not the first time you have gone over

16 your testimony as to what you would be testifying to here in

17 court, is it?

18 A.  What do you mean?

19 Q.  Is this the first time you've been asked any questions

20 about Florita Tolentino, Multicultural and Noel Tolentino?  Let

21 me rephrase it.

22        Did there ever come a time when you've talked to

23 anybody here at this table concerning the testimony that you

24 would be giving in this trial?

25        MR. LEWIS:  Objection, Your Honor, the relevance of

1   this question.

2           THE COURT:  I'll overrule.

3   A.  It was asked me about -- about it.

4   Q.  Yes.  When were you first contacted in connection with this

5   case?

6   A.  I don't really remember the exact time.  It's about

7   December of 2003 or early January.

8   Q.  Of?

9   A.  Of 2004.

10  Q.  And where was this contact made?

11  A.  In the Philippines.

12  Q.  And who was it that contacted you?

13  A.  It's Dante.

14  Q.  And who's Dante?

15  A.  I know he's working with the U.S. Embassy.

16  Q.  Is he a federal agent?

17  A.  I don't know.

18  Q.  Did he show you any credentialing telling you he was a

19  federal agent?

20  A.  No.

21  Q.  When you first talked to -- his name is Onate?

22  A.  Orate.

23  Q.  Okay.  Orate?

24  A.  Dante.

25  Q.  Okay.  One of those names?

1   A.   Yes.

2   Q.   When you first talked to him, where were you at that time?

3   A.   The -- my work.

4   Q.   Where were you working?

5   A.   Cyber City at Pampanga.  Clark --

6   Q.   Okay.  Take it just a little bit slower.  Where were you

7   working?

8   A.   At Pampanga.  Clark Air Base.

9   Q.   And what were you doing there?

10  A.   I'm a call center agent.

11  Q.   Okay.  Now, before you went to work for Multicultural,

12  before you worked for Multicultural, where were you working?

13          MR. LEWIS:  Objection to relevance.

14          THE COURT:  I'll overrule.

15  A.   I was in the -- in our province.

16  Q.   (By Mr. Abraham)  Yes, ma'am.

17  A.   I'm not working.

18  Q.   No, no.  I'm talking about before you went to Multicultural

19  working for them in 2002, did you have a job?

20  A.   No.

21  Q.   Okay.  So when you went to Multicultural you had really no

22  experience in the type of work that you were doing for

23  Multicultural.  Is that correct?

24  A.   Yes.  Right.

25  Q.   Okay.  Now let's jump forward to the year of 2003,

1    December 2003 or January 2004.

2    A.   Uh-huh.

3    Q.   There came a time when you talked with an agent from the

4    United States, correct?

5    A.   Right.

6    Q.   Okay.  Now, was this at his office that you had this

7    meeting?

8    A.   As far as I know it's his office.

9    Q.   Okay.  And where is his office located?

10   A.   In the United States -- the United States embassy.

11   Q.   Okay.  When you went there to talk with him, you talked

12   about Florita Tolentino.  You talked about Noel Tolentino and

13   Multicultural.

14   A.   Only Florita Tolentino.

15   Q.   Okay.  That's the only person you talked about?

16   A.   Right.

17   Q.   Okay.  Now, when he was talking to you, were -- were your

18   conversations with him being recorded in any fashion?

19   A.   I don't -- I don't know.

20   Q.   Okay.  There came a time later when you had later

21   conversations with this same gentleman.  Is that right?

22   A.   Uh-huh.

23   Q.   Correct?

24   A.   Right.

25   Q.   Okay.  In other words, when was the next conversation that

1  you had with him more or less?

2  A.  I don't remember.

3  Q.  Did there ever come a time whenever you prepared a written

4  statement as to what you would be testifying to and what you

5  would -- what your statement was in connection with this

6  matter?

7  A.  I don't -- I don't know.

8  Q.  Well, you -- you would be a person that would know whether

9  or not you signed a statement as to what you're now testifying

10 to.

11 A.  I didn't sign anything.

12 Q.  Okay.  Were you asked to sign anything?

13 A.  No.

14 Q.  When you -- when you had the next conversation with this

15 gentleman, agent, was that also in the Philippines?

16 A.  Right.

17 Q.  Same office?

18 A.  Yes.

19 Q.  And about how much later from December or January of 2004,

20 more or less?

21 A.  About a month or two.  I don't exactly remember.

22 Q.  That's fine.  But you think a month or two?

23 A.  I think so.

24 Q.  Okay.  And as best you recall, any conversations that you

25 had with the agent there in Philippines, you're not aware of

```
1    any of it being recorded.  Is that right?
2    A.  No.
3    Q.  Is that right?
4    A.  I am not aware, right.
5    Q.  Okay.  And, furthermore, you did not sign any sort of a
6    statement indicating what the facts were of this case?
7    A.  Right.
8    Q.  Okay.  How many times would you estimate that you met with
9    this agent there in the Philippines?
10   A.  About two.
11   Q.  Only two times?
12   A.  About two or three.  I don't remember.  Long time ago.
13   Q.  Yes.  And was any paperwork given to you as to what it was
14   that you indicated and stated at those meetings in 2003 and
15   2004?
16   A.  No.
17   Q.  Okay.  When is the next time you had a meeting with any
18   agent or any representative from the United States Government?
19   A.  Here -- okay.  Please rephrase your question.
20   Q.  Yes, ma'am.  There came a time when you had later
21   conversations with federal agents or representatives from the
22   United States.  Am I correct in that?
23   A.  Right.
24   Q.  And when was that that you had those conversations?
25   A.  It's about last week.  I don't know the date.  And then
```

1    Sunday -- last week.  I had a con- -- yeah.

2    Q.  Okay.  Last week?

3    A.  Uh-huh.

4    Q.  And you had conversations with the people at this table?

5    A.  Yes.

6    Q.  Okay.  And did you go over your testimony as to what you

7    would be testifying to here today?

8    A.  Right.

9    Q.  Is that correct?

10   A.  Right.

11   Q.  Okay.  Did you have any paperwork in front of you to

12   refresh your memory as to what you say took place in the year

13   2002?

14   A.  Yes.

15   Q.  What did you have?

16   A.  It's the last exhibit.

17   Q.  And what exhibit it was that?

18   A.  123.

19   Q.  And Exhibit 123 that was the exhibit that you testified to

20   last week that indicated that Florita gave you yellow paper

21   that had something for you to type.  Is that what it was?

22   A.  Right.

23   Q.  Anything else that was discussed at that meeting with

24   regards to your testimony here today and the other day ago?

25   A.  I just made a correction on the -- just like the RPS.  It

1    was written there.  It's RPS.

2    Q.  Yes.

3    A.  Then the name, Ameil Custodio.  The correct one is Rameil

4    Custodio.

5    Q.  Say that last part again.

6    A.  The last name it was written there Ameil Custodio.

7    Q.  Okay.

8    A.  I corrected it to Rameil.

9    Q.  Yes.  When you left in December, the employment of

10   Multicultural in December of the year 2002, actually you had

11   been fired from there, hadn't you?

12   A.  She gave me till December 30 -- 31st.  However, I --

13   Q.  Excuse me, were you fired from Multicultural --

14   A.  No.

15   Q.  -- in December of 2002?

16   A.  No.

17   Q.  Did you leave on your own will?  Or was it the order and

18   request of Florita Tolentino that you leave?

19   A.  Yes.

20   Q.  Okay.  And when you left, the reason that you left is

21   because you and George Verara were trying to set up a separate

22   business that was in competition with Multicultural.  Isn't

23   that right?

24   A.  Please, sir, rephrase your question.

25   Q.  The reason that you were requested to leave the employment

1   of Multicultural is because you and George Verara were

2   attempting to set up a business that was in competition with

3   Multicultural?

4   A.   That's what she said, yes.

5   Q.   And that's why you were fired, correct?

6   A.   I was not fired.

7   Q.   Okay.  That's why she told you to leave the employment?

8   A.   Right.

9   Q.   Okay.  Now, there came a time when there was a discussion

10  about certain paperwork that you had prepared while you were

11  working for Multicultural that you were sending to George

12  Verara in the Houston Omni office that had other type of

13  teachers and/or nurses that you and George Verara were trying

14  to set up separate and apart from Multicultural.  Is that

15  right?

16  A.   That's what she said, right.

17  Q.   Okay.  And let's talk a little about these contracts that

18  you say that Florita Tolentino told Ameil to copy.

19  A.   Right.

20  Q.   Actually, there were 54 copies made of the recruitment

21  contract.  Is that correct?

22  A.   Please, sir, rephrase your question.

23  Q.   Yes, ma'am.  You're familiar with a contract that you say

24  was copied 54 times by Ameil.  Am I correct in that?

25  A.   Right.

```
 1   Q.  Did you copy them or did Ameil copy them?
 2   A.  First, it was Ameil who copied.  And then since we ran out
 3   of it, I made some copies.
 4   Q.  Now the copies that you made were copies of the
 5   probationary recruitment contract.
 6   A.  Right.
 7   Q.  Okay.  Now, when you made these copies, these 54 copies,
 8   there came a time when Florita told you -- Florita Tolentino,
 9   told you to get ahold of these teachers to come in and sign
10   those contracts, correct?
11   A.  Please rephrase your question.
12   Q.  After you and Ameil made the copies of the probationary
13   recruitment contracts, you were told or Ameil was told to call
14   in the teachers from the Philippines to come to your office to
15   sign those contracts.  Is that right?
16   A.  Right.
17   Q.  Okay.  And did you then commence doing that?
18   A.  It's Lillibeth DeCastro who called the teachers --
19   Q.  Okay.
20   A.  -- to come to the office and sign it.
21   Q.  Okay.  And when -- when Lillibeth -- what's her last name,
22   Castro?
23   A.  Yes.
24   Q.  When --
25   A.  DeCastro.
```

1   Q.  -- DeCastro called and told the teachers to come in and

2   sigh the contract, were you responsible for having these

3   teachers sign the contract?

4   A.  I am not responsible for the papers.

5   Q.  No.  No.

6   A.  For those -- for them to sign it.

7   Q.  Did the teachers sign in your presence?

8   A.  I was there, yes.

9   Q.  Did they sign in your presence?

10  A.  Yes.

11  Q.  Okay.  Now, these teachers that signed in your presence,

12  Mrs. Tolentino, you testified the other day ago, didn't want

13  you talking with the teachers about anything.  That's what you

14  testified to the other day.  Is that right?

15  A.  Rephrase your question, please.

16  Q.  The other day you testified that Florita Tolentino told you

17  not to talk to the teachers about anything.  Did you say that?

18  A.  No.

19  Q.  Didn't you say that you didn't want to be scolded by

20  Florita Tolentino about talking with the teachers?

21  A.  Right.

22  Q.  Okay.  Now, let's go back to that.  Did Florita Tolentino

23  tell you, Don't be talking to these teachers about anything?

24  A.  No.

25  Q.  She didn't?

```
1    A.  No.
2    Q.  Okay.  And when you said that you didn't want to be scolded
3    by Florita Tolentino, that had no bearing on you talking to the
4    teachers or not, did it?
5    A.  Please rephrase your question.
6    Q.  When -- when you said the other day ago you didn't want to
7    be scolded by Florita Tolentino --
8    A.  Right.
9    Q.  -- that had nothing to do with you talking to the teachers
10   about anything, did it?
11   A.  I don't exactly understand your question.
12   Q.  Okay.  All right.  The other day ago you testified that
13   Florita told you, Don't talk to these teachers?
14   A.  No.
15   Q.  Okay.  The other day ago you said that, didn't you?
16   A.  No.
17   Q.  Okay.  When you said that you didn't talk to the teachers
18   because you didn't want to be scolded by Florita Tolentino --
19   did you make that statement?
20   A.  Right.
21   Q.  Okay.  Well, she never told you not to talk to them, did
22   she?
23   A.  She never told me.
24   Q.  Okay.  Thank you.  Now, you indicated that there came a
25   time when you were preparing the packet for these 54 people,
```

1    right?

2    A.  Yes.

3    Q.  And that was the Brownsville people?

4    A.  Yes.

5    Q.  And when you were preparing this packet, you had a list of

6    the things that you had to prepare for the purposes of sending

7    that over to the embassy.

8    A.  Right.

9    Q.  Correct.  Okay.  Now -- and you did prepare with the help

10   of other people in your office --

11   A.  Right.

12   Q.  -- the 54 packages.  Am I right in that?

13   A.  I prepared all of the packets.

14   Q.  All of the packets.  You alone?

15   A.  Yes.  I -- I am the one who arranged it.

16   Q.  Yes, ma'am.  Okay.  Now, when you arranged this packet,

17   there were certain things that you had to include in that

18   packet to go to the U.S. embassy, correct?

19   A.  Right.

20   Q.  Okay.  One of the things that you prepared was an I-129.

21   Is that right?

22   A.  As I can remember, it's I-797.  It's the approval notice.

23   Q.  Okay.  Well, let's -- before you get the approval notice,

24   don't you have to have what's called an I-129?

25   A.  I don't recall.  Because there are lots of papers.  I don't

1   remember.

2   Q.  Okay.  Do you know what an I-129 is?

3   A.  I forgot already.  I forgot already about it.

4   Q.  All right.  Let me see if I can refresh your memory.  Do

5   you recall an I-129 being paperwork that is being filed by the

6   attorney, Peter Williamson.  Do you recall that?

7   A.  I don't -- I don't recall it.

8   Q.  Do you know who Peter Williamson is?

9   A.  I just heard his name.

10  Q.  Do you know that he's the lawyer that was representing

11  Brownsville Independent School District?

12  A.  I don't know that he's the lawyer who's representing the

13  teachers.

14  Q.  Do you know that Peter Williamson was the one that filed

15  all of these I-129s on behalf of the Brownsville School

16  District and sent those to immigration?

17  A.  I don't know because he's here.  I just heard his name.

18  Q.  Yes.  But that's what was in your package, wasn't it?

19  A.  Yes.

20  Q.  And that's the package that you sent on to the embassy,

21  correct?

22  A.  I don't remember if it is included.  Because as what I

23  said, I don't remember exactly the -- the papers included in

24  the packet.  As I recall I -- I can only remember the -- as I

25  said, the visa application form.

1    Q.   Yes.

2    A.   The passport.

3    Q.   Yes.

4    A.   Then the I-97.  The contract --

5    Q.   Wait a minute.  I --

6    A.   I-797.

7    Q.   Let's talk about I-797 for just a moment.  Okay?

8    A.   Okay.

9    Q.   The I-797 is the Notice of Action from the immigration

10   people saying that the I-129 is approved.  Isn't that right?

11   A.   Uh-huh.  Yes.

12   Q.   Okay.  So an I-129 is filed these teachers by Brownsville

13   Independent School District with the Immigration Service,

14   right?

15           MR. LEWIS:  Objection.  I think this witness has

16   already testified several times she's not familiar with that

17   process.  So --

18           THE COURT:  Well, my only concern is she's indicated

19   she compiles the packets.  So she can answer the question if

20   she's able to.

21   Q.  (By Mr. Abraham)   Now, the I-129 -- I -- yes.  The I-129

22   is the document that was -- was filed on behalf of all of these

23   schoolteachers, that you made copies and -- you made copies for

24   of the contract, correct?

25   A.   Right.

1  Q.  Okay.  Now, what happens is -- your knowledge of that is

2  that paperwork, the I-129 is now sent to the Immigration

3  Service in the United States, correct?

4  A.  Well, I don't know about it.  Because I only receive all

5  the papers to send to the embassy.

6  Q.  Did you not have a checklist of what it was that --

7  A.  We do have a checklist.

8  Q.  Okay.  And on the checklist one of the items is the form

9  I-129 that you're supposed to send, correct?

10 A.  Yes.

11 Q.  And you're also supposed to send the 797.  Are you not?

12 A.  Right.

13 Q.  Okay.  And you're supposed to send other things that go

14 along with --

15 A.  As what I said there are other papers which I cannot

16 remember.

17 Q.  Okay.  Well, let me refresh your memory if I can.  You were

18 supposed to send a passport.

19 A.  Uh-huh.

20 Q.  And did that for all these 54 people, correct?

21 A.  Right.

22 Q.  And you also sent a visa application form for all of these

23 people, the 54 people.

24 A.  Right.

25 Q.  Okay.  And then you sent the INS approval notice, which is

1   the 797 for all of these 54 people, correct?

2   A.  Yes.

3   Q.  Okay.  And then you sent the contract, that probationary

4   recruitment contract, for all of the 54 people.

5   A.  Yes.

6   Q.  Then you also sent the board of resolution --

7   A.  Yes.

8   Q.  -- from the Brownsville Independent School District,

9   correct?

10  A.  Yes.

11  Q.  Okay.  Then you also sent the Brownsville salary schedule

12  for all of these people.

13  A.  That, I don't recall.  I don't remember.

14  Q.  Okay.  That's fine.  That's fine.  Then the form I-129 you

15  sent.

16  A.  I don't remember.

17  Q.  You know what the G-28 is?

18  A.  No.

19  Q.  Let me just try to refresh your memory the G --

20      MR. LEWIS:  I think she's been pretty clear, Your

21  Honor.  I think she says she doesn't know.  Why is he

22  refreshing her memory?

23      THE COURT:  I'll overrule the objection.

24  Q.  (By Mr. Abraham)  The G-28, if you recall is the lawyer's

25  paperwork that he signs saying he represents the Brownsville

```
 1   Independent School District.  Do you remember that?
 2   A.  No.
 3   Q.  Okay.  Now also, there is what's called the WEKS
 4   Credentials Evaluation record.  Do you know what that is?
 5   A.  Yes.
 6   Q.  Tell us what that is.
 7   A.  I only heard about that WEKS credentials evaluation.  But I
 8   can't really explain what it is because it's not my job to do
 9   it.
10   Q.  Isn't it somebody that comes from the United States to talk
11   to the teachers that are planning to come to the United States
12   and determines that they have this academic ability to come
13   here to the United States, that it's -- their credentials are
14   accurate.  And they're compatible with the United States?
15   A.  That -- I think.  But, as what I said, I don't have a idea
16   about that kind of paper.
17   Q.  Okay.  That's fine.  And then also what you do is you send
18   the diplomas for all these 54 people?
19   A.  Right.
20   Q.  And you also send transcripts of their --
21   A.  Records.
22   Q.  -- of their records.  You do that.  And then you also send
23   their certification of the graduation, correct?
24   A.  Right.
25   Q.  Okay.  And then you also send what's called a resume for
```

1  those teachers, correct?

2  A.  Yes.

3  Q.  Okay.  Now, all of that is a packet that you prepare.  And

4  the other day ago you said you gave that to Florita because she

5  personally wanted to file that with the embassy.  Is that what

6  you said?

7  A.  That's what I said.  I called some to make arrangements at

8  the call center to pick up those packets.  And then some were

9  sent -- was brought by Ms. Florita Tolentino herself to the

10  U.S. embassy.

11  Q.  Okay.  Some you sent and some she sent?

12  A.  Yes.

13  Q.  Okay.  Now, do you know about some sort of a filing fee

14  that you have to prepare and send over to the visa application

15  consul?

16  A.  Filing fee?

17  Q.  Yes, ma'am.

18  A.  I don't remember there's a filing fee.  But as what I can

19  remember, we charged 300 pesos for each teacher so we can send

20  the -- the packets to the embassy.

21  Q.  Yes.  In other words, the embassy charges a fee for

22  these -- to get the application?

23  A.  No.  It's not the embassy who charges.  We -- the 300 pesos

24  we -- we charge from the teachers.  What we collected from the

25  teachers is what we use ever time we call to the call center

1    because it takes a lot of time calling.

2    Q.  Yes.

3    A.  And, you know --

4    Q.  Yes.

5    A.  -- it's an 800 number.  And we have to pay for it.

6    Q.  Yes.  Let met ask you this.  How much is 300 pesos American

7    dollars?

8    A.  One is to 50.  One dollar is to equivalent to 50 -- 50

9    pesos.

10   Q.  Can you tell us --

11   A.  I don't remember the exchange rate during at that time.

12   Q.  Okay.  But, approximately, how much would 300 pesos be,

13   approximately?

14   A.  Okay.  It's about $3.00 -- wait, 6-something.

15   Q.  Okay.  $6.00?

16   A.  Yeah, 6.00.  About 6.00.

17   Q.  Okay.  Do you know about any fee that has to be paid for

18   the filing of the application?

19   A.  Filing of the application -- as what I can remember if you

20   will buy the -- if you -- so you can have the visa application

21   form, you have to pay to the bank.

22   Q.  Yes.  Do you know how much you have to pay to the bank for

23   that visa application?

24   A.  Well, I don't know the exact amount.

25   Q.  Okay.  Would it be about $60?

1   A.  No.

2   Q.  If you don't know, that's fine.

3   A.  I don't know.

4   Q.  Okay.  You indicated that -- that this packet that you send

5   over to the American embassy there in the Philippines -- does

6   it have to have a receipt for the visa application?

7   A.  It's validated.

8   Q.  Yes.  And it's validated by a receipt for the payment of

9   it, isn't it?

10  A.  Yeah.  It's in the -- it's in the visa application form.

11  The validation is there and there's no receipt.

12  Q.  Yes, ma'am.  Now, what happens is whenever that's taken

13  over to the embassy there in the Philippines, what happens is

14  then the embassy then has to approve the visa for the teachers

15  to come to the United States.  Is that right?

16  A.  Right.  If it's all complete.

17  Q.  Yes.  All right.  Now, what happens is that's not done

18  immediately, is it, whenever the package is sent to the embassy

19  you don't get an answer very quickly about the approval, do

20  you?

21  A.  Right.  We don't have the answer right away.

22  Q.  Right.  So what now happens is then Florita Tolentino then

23  commences to try to expedite that situation, doesn't she?  She

24  tries to hurry it up.

25  A.  Right.

1   Q.  Okay.  And when she tries to hurry it up, she's making

2   telephone calls and actually making visits to the embassy

3   trying to get the approval quickly.  Is that right?

4   A.  Please rephrase your question.

5   Q.  Yes, ma'am.  In other words, Florita Tolentino tries to get

6   these via applications approved quickly?

7   A.  Right.

8   Q.  Doesn't she?  Okay.  And Florita can go to the embassy in

9   the Philippines in order to try to quickly do that.  Can she

10  not?

11  A.  Right.

12  Q.  You can't do that, can you?

13  A.  No.

14  Q.  Okay.  And so what happens, as I understand -- have you

15  ever been to the embassy?

16  A.  During that time, no.

17  Q.  Okay.  So -- so what -- have you been there lately?

18  A.  Way back 2004.

19  Q.  Yes.  Okay.  2004 you went there?

20  A.  Yeah.  I went there 2004.  And -- yeah.

21  Q.  Okay.  You know that -- you know that at the embassy there

22  is a certain section for the entrance for United States

23  citizens, correct?

24  A.  Yes.

25  Q.  Okay.  And then there's an entrance for people from the

David A. Perez, RMR, RPR

1    Philippines.  Is that right?

2    A.  Right.

3    Q.  And you know that the entrance for the Philippines is a

4    very difficult thing to get into that embassy?

5    A.  Right.

6    Q.  Right.  United States citizens, all they have to do is show

7    identification who they are and they're U.S. citizens and they

8    can go right in, correct?

9    A.  Right.

10   Q.  And you know Florita Tolentino is a United States citizen,

11   right?

12   A.  Right.

13   Q.  Okay.  Now, the applications with regards to these 54

14   applicants, all of those visas came back to your office,

15   correct?

16   A.  Right.

17   Q.  All of them were approved, were they not?

18   A.  Yes.  They were approved.

19   Q.  Okay.  And so when they were approved, there came a time

20   when, again, someone from Multicultural called in the teachers

21   for the purposes of the teachers coming in and getting their

22   visas, right?

23   A.  Right.

24   Q.  Okay.  And the teachers came in.  Am I right in that?

25   A.  Right.

1   Q.  And when the teachers came in, these teachers came in to

2   pay the fee to Multicultural, right?

3   A.  Yeah.  They came to pay the fee that's with Lillibeth De

4   Castro, not me anymore.

5   Q.  Okay.  But you were present, weren't you?

6   A.  Yes.

7   Q.  And you were present when these teachers came in to

8   retrieve their visas and to pay the fee to Multicultural?

9   A.  Right.

10  Q.  And, as a matter of fact, you said you counted the money

11  along with the other people there in the office.

12  A.  Yeah.  That's after we -- we were done with all of the

13  teachers.

14  Q.  Yes.  In other words, after -- after you checked all the

15  funds --

16  A.  Yes.  After all the funds were collected.

17  Q.  Then there came a time when you and the other office

18  members counted it.

19  A.  Yes.

20  Q.  As a matter of fact, you even got a tip for that, didn't

21  you?

22  A.  As what I said, after all our hard work, we received $100

23  each.

24  Q.  Yes, ma'am.  Okay.  Now, I want to talk to you a little bit

25  about the contracts that you say that you made updates on those

1   contracts?

2   A.  Yeah.  The dates are handwritten.

3   Q.  Yes, they're handwritten.  And you just grabbed any date

4   out of the sky and put it on the contract?

5   A.  Um, okay.  Um, there -- I wrote in some dates.  And it was

6   Lillibeth DeCastro who asked me to write it.  Because we have

7   to -- we have to change the penmanship.

8   Q.  Well, let me ask you this.  When the teachers came in to

9   sign the contract -- when the teachers came in to sign the

10  contract, why wasn't it dated then?

11  A.  They dated it when they signed it.

12  Q.  Yes.  What date did you put in there?

13  A.  It's in the left side --

14  Q.  Yes.

15  A.  -- of the contract.

16  Q.  Yes.  The left side of the contract.  That's the date that

17  these people came in to sign the contract, wasn't it?

18  A.  No.  I don't -- I don't think so.

19  Q.  All right.  In any event -- in any event, Lillibeth is the

20  one that told you make up these dates and put them into the

21  contract?

22  A.  Right.

23  Q.  It wasn't Florita.

24  A.  No.

25  Q.  Okay.  Now with regards to the -- with regards to this

David A. Perez, RMR, RPR

1    date, when you're talking about these teachers coming in, these

2    teachers coming in and signing these contracts, you think that

3    was sometime in the summertime of 2002?

4    A.   Summer.   It's about July.

5    Q.   About July.   All right.   And at that time you had been

6    employed by Multicultural with no prior experience for about

7    five months.

8    A.   Right.

9              MR. ABRAHAM:   May I take just a moment, Your Honor?   I

10   pass the witness, Your Honor.

11             THE COURT:   All right.   Mr. Ederer?

12             MR. EDERER:   Just a few questions, Your Honor.

13                         CROSS-EXAMINATION

14   BY MR. EDERER:

15   Q.   Do you know Noel Tolentino?

16   A.   Yes.   I -- I've heard it from my --

17   Q.   Yeah, but have you ever met him?

18   A.   No.

19   Q.   You've never seen Noel Tolentino?

20   A.   I've seen him once.   He's just in the car and never came

21   into the office.

22   Q.   Okay.   Thank you.   Tell me, earlier you said that you do

23   not drive.

24   A.   Yes.

25   Q.   The bus system in the Philippines is good, isn't it?

1    A.  Not really.

2    Q.  Public transportation.

3    A.  Yeah, because it's really crowded.

4    Q.  Very crowded?

5    A.  Yeah.

6    Q.  Is that the way you get around town is -- is on the buses

7    or taxi cabs?

8    A.  Taxi.

9    Q.  Taxis.  Is there a lot of taxis?

10   A.  A lot.

11   Q.  Is it expensive to own a vehicle, to own a car, in the

12   Philippines?

13   A.  Yes.

14   Q.  Gasoline is expensive?

15   A.  Uh-huh.

16   Q.  Yeah.  So most people take public transportation, taxi

17   cabs, buses, this type of thing?

18   A.  Right.

19   Q.  Thank you.  No further questions.

20            THE COURT:  Mr. Antcliff?

21            MR. ANTCLIFF:  I don't have any questions, Judge.

22            THE COURT:  Mr. Lyle?

23            MR. LYLE:  Thank you, Your Honor.

24

25

```
1                      CROSS-EXAMINATION
2    BY MR. LYLE:
3    Q.  Ma'am, my name is Sid Lyle.  And I represent Roland Sotelo.
4    You don't know Roland Sotelo, do you?
5    A.  No, I don't know him.
6    Q.  In fact, you've never had any dealings with Roland Sotelo?
7    A.  No.
8    Q.  You've never seen Roland in the Philippines?
9    A.  No.  No.
10   Q.  And as far as you know, Roland Sotelo didn't have anything
11   to do with the things you were doing there in the Philippines.
12   A.  No.  Haven't heard anything about him.
13           MR. LYLE:  Pass the witness.
14           THE COURT:  Go ahead, Mr. Lewis.
15           MR. LEWIS:  Thank you, Your Honor.
16                      REDIRECT EXAMINATION
17   BY MR. LEWIS:
18   Q.  Are you okay?
19   A.  I yeah.  I've got a cold.
20   Q.  Just to clarify a couple of things, Ms. Buenbrazo.  Earlier
21   when Mr. Abraham was asking you about a man that you met or
22   went to talk to at the U.S. embassy in 2004, do you remember
23   his name?
24   A.  I only -- before I know him of Dante Orlate.  But it's
25   Dante Orate.
```

```
 1   Q.  Dante?

 2   A.  Dante.

 3   Q.  Dante Orate.

 4   A.  Orate.

 5   Q.  That's his name?

 6   A.  Yes.

 7   Q.  Is that the person you met with?

 8   A.  Yes.

 9   Q.  Okay.  And just a little bit ago, when Mr. Abraham was

10   asking you about these contracts you prepared -- do you have

11   39A in front of you?

12   A.  Yes, I have it.

13   Q.  And if you will flip it over to the second page.  If you

14   turn it over -- if you need to, pull -- okay.  Do you see it?

15   A.  Yes.

16   Q.  Okay.  Now, when you indicated on the left is where

17   Lillibeth told you to place a date, are you referring to this

18   over here on your left?

19   A.  Yes.

20   Q.  Okay.  And when the teacher came in and signed, the teacher

21   signed on this line down here?

22   A.  Right.

23   Q.  And then the teacher would date when this --

24   A.  Yes, that's the date when they signed it.

25   Q.  Okay.  Do you have 39F in front of you?
```

 1    A.  Yes.

 2    Q.  Okay.  39F.  Is this also one of the contracts that you

 3    prepared back in July of 2002?

 4    A.  Yes.

 5    Q.  Okay.

 6              MR. LEWIS:  Government moves for introduction of 39F.

 7              THE COURT:  I don't show 39F.

 8              MR. LEWIS:  It's not on the exhibit list, Your Honor.

 9    But it's in everybody's exhibit book.

10              THE COURT:  Okay.  Gotcha.

11              MR. ABRAHAM:  It's not in my exhibit book.  May I take

12    a minute to look at it?

13              THE COURT:  Sure.  Sure.

14              MR. ABRAHAM:  I have no objection.

15              MR. EDERER:  No, objection, Your Honor.

16              MR. ANTCLIFF:  No objection.

17              MR. LYLE:  No objection, Your Honor.

18              THE COURT:  Just for clarification.  It's a

19    contract --

20              MR. LEWIS:  I apologize.

21              THE COURT:  Whose is it?  Whose contract?

22              MR. LEWIS:  It's a Brownsville contract involving a

23    teacher by the name of Rose Marie Valentin Bugtong,

24    B-U-G-T-O-N-G.

25              THE COURT:  Okay.  Thank you.  It will be admitted.

```
 1            MR. LEWIS:  Thank you, Your Honor.
 2   Q. (By Mr. Lewis) Do you know when Ameil Mateo approached
 3   Florita Tolentino with the contract in her hands?
 4   A.  She did not approach Ameil in his desk.  She's at her
 5   table.
 6   Q.  She's at her table?
 7   A.  Yeah.
 8   Q.  Did she call him over or --
 9   A.  Yes.
10   Q.  She called him over to her table?
11   A.  Yes.
12   Q.  Okay.  Did she have papers in her hand that you could see?
13   A.  Right.
14   Q.  Okay.  Did she -- could you tell in one of her hands, did
15   she have one of these one-year probationary contracts for
16   recruitment?
17   A.  Yes.
18   Q.  Okay.  And what were her instructions to Ameil that you
19   overheard?
20            MR. ABRAHAM:  Excuse me.  This is repetitions.  He
21   brought that out on direct examination.  I object to it.
22            THE COURT:  All right.  Any response.
23            MR. LEWIS:  Offered for clarification, Your Honor.  I
24   think counsel in his cross-examination was wanting to know what
25   exactly the witness overheard Ms. Tolentino say about 16 and 54
```

1    contracts.  I'm trying to clarify.

2         THE COURT:  I'll overrule the objection.

3    Q.  (By Mr. Lewis)  What was the conversation that you heard --

4    overheard Florita tell Ameil Mateo about these contracts?

5    A.  Okay.  You put in the name of the teacher here.

6    Q.  That's what she's telling Ameil?

7    A.  Yes.

8    Q.  Okay.

9    A.  Write in the name of the teacher here.  And also here at

10   the back.  To also include the see attached board resolution.

11   And then also the name here.

12   Q.  Of the teacher?

13   A.  Of the teacher.

14   Q.  Okay.  Now, when she is talking to Ameil about this

15   one-year probationary contract when she says put the name in

16   here, is this in reference to the top of this contract?

17   A.  Yes, right.

18   Q.  Can you tell whether or not that the contract she has where

19   she's showing Ameil, does it already have a name or is it

20   blank?

21   A.  Um, as what I can remember it has a name in it.

22   Q.  Okay.

23   A.  Yeah.

24   Q.  And then -- was that the contract that you and Ameil then

25   take and use?

David A. Perez, RMR, RPR

1   A.  Right.

2   Q.  What did you have to do with that contract?

3   A.  I have to -- to erase first the name.

4   Q.  Okay.

5   A.  And then I white it out with a liquid paper.  Then

6  photocopy it so it became blank.  Then that's the time -- after

7  we have the blank contract, that's the time I encoded a name,

8  print it out.

9   Q.  When you say encoded, you typed on computer?

10  A.  Computer.

11  Q.  Okay.  Now, did Florita also have in her hands when she was

12  talking with Ameil any other documents --

13       MR. ABRAHAM:  Objection, he's leading the witness.

14  And I object to it.

15       THE COURT:  All right.  I'll sustain the objection.

16  Q.  (By Mr. Lewis)  Besides this one contract, what other

17  papers, if any, did Ms. Tolentino have in her hands that you

18  could see?

19  A.  The 16 contracts.

20  Q.  16?

21  A.  From Brownsville, yes.

22  Q.  Okay.  Do you recall Ms. Tolentino specifically telling you

23  how many contracts to prepare?

24  A.  54.

25  Q.  Okay.  Did you and Ameil prepare 54 contracts?

1    A.   Yes.

2    Q.   Now, do you recall Mr. Abraham's questions concerning a --

3    George Verara is what he called him?

4    A.   Verar.

5    Q.   Okay.  His name is George Verar?

6    A.   Yes.

7    Q.   Could you spell that last name, please?

8    A.   V-E-R-A-R.

9    Q.   Okay.  And do you recall the occasion -- well, let me ask

10   it this way.  Were you working with George Verar in a competing

11   business against Multicultural?

12   A.   No.

13   Q.   Okay.  Did someone accuse you of doing that?

14   A.   Yes.

15   Q.   And who was that?

16   A.   Mrs. Florita Tolentino.

17   Q.   Okay.  And do you remember -- do you recall, approximately,

18   time frame when that happened?

19   A.   December.

20   Q.   Of?

21   A.   2002.

22   Q.   And do you recall that particular meeting or how that came

23   about?

24   A.   Yes.

25   Q.   Okay.  And what was -- was anything shown to you?

David A. Perez, RMR, RPR

1   A.   Yes.

2   Q.   What was shown to you?

3   A.   Okay.  When -- when we came to the hotel, um --

4   Q.   Why were you -- okay.  First, why did you go to a hotel?

5   A.   She told Cora to bring me to hotel, to the hotel.  It's a

6   Holiday Inn as what I can remember.  And then she talked to me.

7   Q.   Who is she?

8   A.   Mrs. Florita Tolentino talked to me in front of Corazon

9   Timpango accusing me of those papers that I sent to George

10  Verar.

11  Q.   When she talked to about papers that had gone to George

12  Verar, did she show you those papers?

13  A.   Yes, she showed me all those papers.

14  Q.   Had you seen those papers before?

15  A.   I have seen those papers before, but it was Corazon

16  Timpango's papers.

17  Q.   Where had you -- when you saw those papers before, where

18  had they been?

19  A.   It's in the desk of Corazon Timpango.

20  Q.   Okay.  Did you send those papers to George Verar?

21  A.   No.  Why will I send those?  Those are not mine.

22  Q.   And do you remember what those papers were about?

23  A.   Yes.

24  Q.   Okay.  What were those papers about?

25  A.   Recipes(sic) of nurses, physical therapists, teachers and

David A. Perez, RMR, RPR

1    some other profession.

2    Q.  And did you explain -- did you explain -- or -- let me ask

3    it this way.  Did Mrs. Tolentino allow you to explain yourself?

4    Did she give you a chance to respond to --

5    A.  Yes.

6    Q.  Okay.  And so what did you tell her?

7    A.  I told her that those papers came from Corazon Timpango --

8    wherein -- wherein it says there there's a letter addressed to

9    Cora, Dear Cora.  I told her I am not Cora.  I'm Jeng.  So you

10   mean Cora is me?  And there's also the envelope -- the air mail

11   envelope that was also photocopied, which is addressed to

12   Corazon Timpango from her friend at Ohio, Don.  So it was Don

13   who sent to her those resumes asking her help to contact those

14   people.

15   Q.  Okay.  And is that part of the explanation you provided to

16   Ms. Tolentino?

17   A.  I didn't explain to her how -- how those papers came into

18   the office.  I only told her this those papers are not mine.

19   It's Corazon's documents, papers.

20   Q.  What was Florita's response to that?

21   A.  No.  She sold told me that, No, it's you who sent this

22   paper to George.  And you're doing monkey business.  You're

23   doing business.  Because George is working with other company.

24   Q.  Did you know if George was working with another company?

25   A.  No.

```
 1    Q.  Had George talked to you about any business?
 2    A.  No.  As what I know, he doesn't have a job that time.
 3    Q.  Okay.  Prior to going to work for Multicultural you said
 4    you were unemployed?
 5    A.  Yes.
 6    Q.  Okay.  Can you explain to the jury how you go about setting
 7    up a competing business against Multicultural in the
 8    Philippines?
 9    A.  No.  I don't have idea about the business.
10    Q.  Okay.  As a result of that meeting, what did Ms. Tolentino
11    tell you?
12    A.  She told me that I cannot let you stay in the office
13    because blood is thicker than water.
14    Q.  And what date did she tell you?
15    A.  It's early of December of 2002.
16    Q.  Well, when you say early 2002, this meeting takes place in
17    December though?
18    A.  December, right.
19    Q.  Okay.  How long did she tell you you could continue to work
20    at --
21    A.  Yeah, she told me, I will let you stay until December 31st
22    of 2002.  But I cannot let you stay in the office.
23    Q.  Okay.  So did you continue to work though?
24    A.  No.  What I did is that I made a resignation letter.  I
25    submitted it December 15th.
```

1    Q.  And why did you do that?

2    A.  Well, since she accused me of having that kind of business

3    with my cousin, who would believe in me.

4    Q.  Okay.  Looking back at 39F, the name Rosemarie Valentin

5    Butong, where would you have gotten that name to place in the

6    contract?

7    A.  It's in the list.

8    Q.  A list --

9    A.  A list of teachers.

10   Q.  Was there a list kept at Multicultural?

11   A.  Yes.

12   Q.  And when you made this and the other contracts, did you go

13   off that list?

14   A.  Yes.  So I could get the correct spelling of their name and

15   last names.

16          MR. LEWIS:  Pass the witness.  Subject to redirect.

17          THE COURT:  Mr. Abraham?

18          MR. ABRAHAM:  Yes.  Just a few questions.

19                     RECROSS EXAMINATION

20   BY MR. ABRAHAM:

21   Q.  When you made the copies for the 54 individuals, remember

22   that?

23   A.  I didn't make -- I didn't made all the copies.

24   Q.  Okay.  You made some --

25   A.  Some.

```
1   Q.  And Ameil made some of them, correct?
2   A.  Right.  Ameil made the 54 copies.  And as what I said since
3   we ran out of it, I made some.
4   Q.  Okay.  In any event these 54 people that contracts were
5   made for, copies of these contracts were made for, were the
6   teachers that had been recruited by Brownsville Independent
7   School District, correct?
8   A.  Right.
9   Q.  Okay.  And so what you then did is after you made the
10  copies of the contract, you then called the teachers who had
11  been recruited by Brownsville to come sign them.
12  A.  I didn't call the teachers.
13  Q.  Lillibeth did.
14  A.  Yes.
15  Q.  Lillibeth then called the teachers, the 54 teachers that
16  had been recruited by Brownsville, to come sign the contracts,
17  correct?
18  A.  Right.
19  Q.  Okay.  And now what happens is these people come sign the
20  contract?
21  A.  Right.
22  Q.  Okay.  Now let's go back to the hotel room whenever you
23  were asked to come to the hotel room where Florita was,
24  concerning this matter of you being fired, okay.  As a matter
25  of fact, you told Florita that you didn't do this, correct?
```

RECROSS - FRANCIA OMUNPRAZO

1    A.  Right.

2    Q.  She didn't believe you, did she?

3    A.  She didn't.

4    Q.  Okay.  As a matter of fact she fired you and Cora, that

5    lady that was with you, Corazon.

6    A.  I don't know about Cora.  Because I first left the office.

7    Q.  Yes.  But you know later at that very same juncture that

8    Corazon, the one that went with you to the hotel, was also

9    fired.

10   A.  No, I don't know because -- I -- I didn't have any

11   communication with any of the Omni staff after I left the

12   office.

13          MR. ABRAHAM:  I have nothing further.

14          THE COURT:  Mr. Ederer?

15                    RECROSS EXAMINATION

16   BY MR. EDERER:

17   Q.  Were you angry that you were fired?

18   A.  I cried because I lost my job.  But I'm not mad.  I'm not

19   angry.  I am a single mom.  And it's really hard to find a job

20   in the Philippines.

21          MR. EDERER:  No further questions.

22          THE COURT:  Thank you.

23          MR. ANTCLIFF:  No questions, Your Honor.

24          THE COURT:  Mr. Lyle?

25          MR. LYLE:  No questions.

1       THE COURT:  Anything further, Mr. Lewis?

2       MR. LEWIS:  No, Your Honor.

3       THE COURT:  All right.  Is this witness free to leave?

4       MR. LEWIS:  May this witness be excused?

5       MR. ABRAHAM:  May we approach, Your Honor?

6       THE COURT:  Sure.

7       (End of requested testimony.)

8                               **INDEX**

9

10                  Direct    Cross    Redirect    Recross

11  WITNESSES FOR THE
    GOVERNMENT:

12

13  FRANCIA BUENBRAZO         3,39,41    41         51,53

14

15  EXHIBITS:                                      Admitted

16  Government

17  39F    Contract                                        44

18                      * * * * * *

19      I certify that the foregoing is a correct transcript

20  from the record of proceedings in the above-entitled matter.  I

21  further certify that the transcript fees and format comply with

22  those prescribed by the Court and the Judicial Conference of

23  the United States.

24

25  Signature:/s/_____Date:  August 5, 2013
                David A. Perez, RMR, RPR

                    David A. Perez, RMR, RPR